

NUMBER 13-11-00249-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

JOSE ANTONIO PIZANO,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

---

### On appeal from the 92nd District Court
### of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Vela**
**Memorandum Opinion by Justice Garza**

A jury convicted appellant, Jose Antonio Pizano, of capital murder committed in the course of committing or attempting to commit aggravated robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2), (b) (West Supp. 2011). The trial court sentenced him to life imprisonment without the possibility of parole. *See id.* § 12.31(a)(2), (b)(2) (West 2011).

By four issues, appellant contends: (1) the trial court erred in denying his motion to suppress certain oral statements made during a custodial interrogation; (2) the trial court erred in admitting certain DNA evidence because the search warrant authorizing the DNA evidence was not based on sufficient probable cause; and (3) the evidence is legally and factually insufficient to support his conviction. We affirm.

## I. BACKGROUND

On April 9, 2009, around 9:30 p.m., Alberto Marin ("Marin"), his wife, Nora Elia Zuniga, and other family members returned home from a church service. Upon entering their home, they were confronted by an armed masked man demanding money. Shortly thereafter, a second masked man entered the house through a kitchen window. Both men wore gloves and carried guns; they asked for money and demanded to know the location of the safe. The men took Marin into a bedroom and forced the other family members to stay in the living room. A few moments later, the family heard shots from the bedroom. The two intruders ran out of the house. Marin staggered out of the bedroom and fell to the floor.

A police officer, responding to an emergency call regarding the home invasion, approached the neighborhood in his vehicle. He observed a man in black clothing running across the road. The officer lost sight of the man, but shortly thereafter encountered another man, later identified as Alberto Pizano ("Alberto"), appellant's brother. Alberto, who had blood stains on his shoes and clothing, was arrested. Pursuant to information obtained over the next several weeks, appellant was arrested.

## II. THE EVIDENCE[1]

---

[1] We have summarized only the testimony most pertinent to the issues raised. *See* TEX. R. APP.

2

## A. Carlos Garcia

Carlos Garcia, an investigator with the McAllen Police Department, assisted Officer Isaac Tamez with the investigation of the case. Officer Garcia interviewed Zuniga and Marin's brother, Oscar Duque Marin ("Oscar"). Officer Garcia learned from Oscar that Alvaro DeArmas had rented a room from Oscar for the past two to three years. Officer Garcia requested that Oscar and DeArmas come to the station to be interviewed. They arrived together; Oscar was interviewed first. When Officer Garcia returned to the lobby to interview DeArmas, however, DeArmas had left the station and did not return. DeArmas did not return to Oscar's house to retrieve his possessions. Attempts to locate him were unsuccessful. The police later issued a warrant for his arrest, but DeArmas was never apprehended.

On April 10, 2009, the day after the invasion, Officer Garcia visited with appellant's sister, Esperanza Perez. Perez directed Officer Garcia to appellant, who lived next door. Officer Garcia and Detective Tony Carrizales contacted appellant at his residence. Appellant told the officers that around 6:30 that morning, he had reported his van was stolen. The officers asked appellant about Alberto; appellant said he had not seen Alberto for several days and that they did not spend much time together. Officer Garcia asked appellant if he had a cell phone number; appellant said he did not.

On April 14, 2009, Officers Garcia and Tamez interviewed appellant a second time at the supermarket where he was employed. The officers showed appellant a photograph of DeArmas and asked if appellant recognized him. Appellant said he did not.

---

P. 47.1.

Officer Garcia noticed that a pair of Wells Lamont gloves recovered from the crime scene appeared to be new. Sergeant Xavier Garcia learned that the Wal-Mart in Palmhurst—near appellant's residence—had recently sold two pair of the same brand and style of gloves. One of the sales occurred shortly before April 9 and the second sale occurred after April 9. Officers Garcia and Tamez met with security personnel at the Palmhurst Wal-Mart. After viewing the store's video surveillance recording of the pre-April 9 glove purchase, the officers discovered that Alberto and appellant purchased a pair of the Wells Lamont gloves on March 29, 2009.

On April 18, 2009, Officers Garcia and Tamez visited appellant at his residence and asked that he come to the police station for an interview. Officer Garcia stated that appellant was a "person of interest," but was not in custody or under arrest. At the station, the officers showed appellant a photo of the Wells Lamont gloves recovered from the crime scene. Appellant did not recognize the gloves. The officers told appellant about the video showing him and Alberto purchasing the gloves at the Palmhurst Wal-Mart. The video shows appellant and Alberto entering the store, going directly to the glove-display area, and then proceeding directly to the register. They did not purchase any other items. Appellant paid for the gloves at the register, and the two men left the store. After appellant was told about the video, he insisted that he did not recall purchasing the gloves. During the interview, appellant became upset with Officer Tamez because Officer Tamez kept asking questions about Alberto.

Officer Garcia asked appellant to provide a buccal swab as a DNA sample, but he refused. Officer Carrizales stayed with appellant at the station while Officers Garcia and Tamez obtained a search warrant authorizing the taking of a blood sample from

4

appellant. The officers escorted appellant to the hospital where a blood sample was obtained. The officers then took appellant home. During the interview, appellant did not ask to leave and was not handcuffed.

Officer Garcia subpoenaed cell phone records from various members of Marin's family, as well as DeArmas. DeArmas's cell phone records showed that on April 9, 2009, the day of the invasion, DeArmas received two calls from a cell phone number that was later identified as appellant's number. According to Officer Garcia, he did not have probable cause to arrest appellant until he learned that appellant called DeArmas twice on April 9, about three hours before the home invasion. After obtaining this information, a warrant was issued for appellant's arrest, and he was arrested on May 1, 2009. Appellant's cell phone records show that he requested to close the cell phone account on April 10, 2009, the day after the murder, but the account was actually closed a month later, on May 10, 2009.

On June 18, 2009, appellant's van was found in McAllen. After obtaining a search warrant, Officer Garcia found several items in the van, including black zip ties very similar to ones found at the crime scene, gray duct tape similar to that found at the crime scene, and a hooded blue jean jacket.

On cross-examination, defense counsel established that DeArmas's cell phone records show that DeArmas did not answer the first call appellant made to him; rather, the call was forwarded because DeArmas was using the phone at that time. Counsel also established that when appellant went to the police station on April 18, the officers did not tell him that he was not required to come. Officer Garcia stated that it was not necessary to advise appellant of his rights because he was not in custody. If appellant

5

had asked to be taken home, Officer Garcia would have taken him home.

## B. Isaac Tamez

Isaac Tamez, an investigator with the McAllen Police Department, testified that he investigated the crime scene and followed up on the arrest of Alberto. On April 14, Officer Tamez and Officer Garcia questioned appellant at his workplace regarding Alberto's associates. Appellant said he did not spend time with Alberto and did not know Alberto's friends. On April 17, Officers Garcia and Tamez viewed the Wal-Mart video showing appellant and Alberto purchasing the gloves on March 29. The video shows appellant purchasing the gloves and handing the bag to Alberto.

On April 18, Officers Tamez and Garcia picked appellant up at his residence and took him to the police station for questioning. The officers showed appellant a picture of the gloves; appellant said he did not recognize them. Appellant also said he did not recall purchasing the gloves at Wal-Mart with Alberto. During the questioning, Officer Tamez suggested that appellant was not being honest. Appellant became upset and said he would continue talking to Officer Garcia, but did not want to continue talking to Officer Tamez. Officer Tamez left the room, and Officer Garcia continued the interview.

On cross-examination, Officer Tamez stated that he prepared the probable cause affidavit supporting the search warrant authorizing the taking of a blood sample from appellant. When Officer Tamez left the police station to obtain a judge's signature on the search warrant, he asked Detective Carrizales to "keep an eye" on appellant.

## C. Larry Tineo

Officer Larry Tineo stated that he responded to a report of the home invasion. As

6

he approached the area, he saw a man in black clothing running across the road.[2] Officer Tineo lost sight of the man, but encountered a second man, later identified as Alberto. When Officer Tineo brought Alberto back to the crime scene, he noticed that he had red stains on his shoes and clothing.

### D. Maria Esperanza Del Angel

Maria Esperanza Del Angel, then a crime scene investigator with the McAllen Police Department, testified regarding evidence collected from the crime scene. Among other items, a Wells Lamont glove was found in the back yard of the residence at the crime scene. The matching Wells Lamont glove was found in a nearby irrigation ditch. Maria Del Angel also identified photographs of appellant's van after it was recovered. Close-up photographs of the van's keyholes were admitted to show that there was no evident keyhole damage suggesting a break-in. Officer Del Angel also testified that duct tape and black zip ties were found in the van.

### E. Roberto Del Angel[3]

Roberto Del Angel, also a crime scene investigator for the McAllen Police Department, testified regarding various items collected from the crime scene and nearby locations. Several items were collected in a nearby construction yard, including a roll of tape, a white shirt, and a brown Stanley glove. Several more items were collected from a nearby irrigation ditch, including security ties, a black shirt, a cell phone holster, a screwdriver, a Stanley glove, a Wells Lamont glove, and a hoodie-type mask.

### F. Edna Lissette Zavala

---

[2] When Officer Tineo saw the man running across the road, his vehicle's video recorder was activated. The video was introduced into evidence.

[3] Roberto Del Angel was asked if he was related to Maria Esperanza Del Angel; he said "yes," but was not asked to elaborate.

Edna Lissette Zavala, a forensic scientist in the DNA and serology section of the Texas Department of Public Safety Crime Lab, testified generally regarding DNA testing and how it is conducted. Ms. Zavala testified that the DNA profile of scrapings obtained from State's Exhibit 8-A—the Wells Lamont glove found in the irrigation ditch—was consistent with a mixture of appellant's DNA and that of an unknown individual. Although the scrapings from Exhibit 8-A contained a mixture of DNA, appellant's DNA was present in larger quantities and constituted the "major component" of the DNA profile. Ms. Zavala also testified that the DNA profile obtained from State's Exhibit 28-A—the matching Wells Lamont glove found at the crime scene outside the kitchen window—was consistent with appellant's DNA profile. The DNA profile obtained from a hoodie-type mask found in the irrigation ditch was consistent with a mixture of DNA which included appellant, Alberto, Marin, and an unknown individual.

On cross-examination, Ms. Zavala admitted that appellant's DNA, found on the Wells Lamont glove recovered from the crime scene, could have been deposited on the glove on March 29, 2009, when the gloves were purchased.

## G. Oscar Duque Marin

Oscar testified that DeArmas lived in his home for approximately a year and a half. In the six months before his death, Marin went to Oscar's house almost every day for discussions about the Bible. Marin often talked about his businesses when DeArmas was present. Marin had a real estate business and had owned a jewelry business in the past. DeArmas knew that Marin owned a safe because he and Oscar had helped move the safe from a jewelry store to Marin's garage.

On the evening of April 9, Oscar and other family members returned from church

8

to Marin's house. The other family members entered the house first. When Oscar got to the door, he saw someone inside with a gun in his hand. Oscar ran to a neighbor's house next door; the neighbor retrieved a weapon, and the men went back to Marin's house. When they reached the door, however, they heard gunshots; frightened, the neighbor returned home. Oscar saw two men running from Marin's house, one taller than the other; neither man was DeArmas. Oscar had not seen DeArmas since he abruptly left the police station.

### III. SUFFICIENCY OF THE EVIDENCE

By his third and fourth issues, appellant contends the evidence is factually and legally insufficient to support his conviction. In his combined argument regarding both issues, appellant argues that: (1) although his DNA was found on a glove at the crime scene, there is no evidence establishing when the DNA was deposited on the glove, and "there is no other evidence to support [appellant's] involvement"; and (2) DeArmas knew Marin had a safe at his house, but the only evidence of a relationship between appellant and DeArmas is appellant's phone call to DeArmas about three hours before the home invasion.

Appellant does not separately argue his legal and factual sufficiency challenges. Appellant acknowledges that the Texas Court of Criminal Appeals has directed intermediate courts to apply a single standard of review—the *Jackson v. Virginia* standard—to legal and factual sufficiency challenges in criminal cases. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Notwithstanding *Brooks*, appellant asserts that "[t]he Court of Criminal Appeals has no authority to abrogate the specific provisions of

the Texas Constitution or state statutes" and argues that "this Court has the constitutional and statutory authority to review factual and legal sufficiency issues."

"As an intermediate court of appeals, we are bound to follow the precedent of the court of criminal appeals." *Ervin v. State*, 331 S.W.3d 49, 53 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). The court of criminal appeals has characterized *Brooks* as "abolish[ing] factual-sufficiency review." *See Howard v. State*, 333 S.W.3d 137, 138 n.2 (Tex. Crim. App. 2011). Accordingly, we apply only the *Jackson* sufficiency standard to complaints styled as legal or factual sufficiency challenges. *See Ervin*, 331 S.W.3d at 54.

## A. Standard of Review and Applicable Law

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Brooks*, 323 S.W.3d at 898–99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt"). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Id.* (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)). We must resolve any inconsistencies in the testimony in favor of the verdict. *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

10

In reviewing the legal sufficiency of the evidence, we look at events occurring before, during, and after the commission of the offense, and we may rely on actions of the appellant that show an understanding and common design to do the prohibited act. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Each fact need not point directly and independently to the appellant's guilt, so long as the cumulative effect of all the incriminating facts is sufficient to support the conviction. *Id.*

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 307 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

A person commits capital murder if he intentionally or knowingly causes the death of an individual and intentionally commits the murder in the course of committing or attempting to commit robbery or aggravated robbery. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011), § 19.03(a)(2); *Ervin v. State,* 333 S.W.3d 187, 200 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *Hernandez v. State*, 198 S.W.3d 257, 261 (Tex. App.—San Antonio 2006, pet. ref'd). A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another, or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX.

11

PENAL CODE ANN. § 29.02(a) (West 2011); *Ervin*, 333 S.W.3d at 200. Aggravated robbery is robbery with the use or exhibition of a deadly weapon. TEX. PENAL CODE ANN. §§ 29.02, 29.03 (West 2011). A firearm is a deadly weapon. *Id.* § 1.07(a)(17) (West Supp. 2011).

Capital murder is a result-of-conduct oriented offense; the crime is defined in terms of one's objective to produce, or a substantial certainty of producing, a specified result, i.e., the death of the named decedent. *Roberts v. State*, 273 S.W.3d 322, 329 (Tex. Crim. App. 2008). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b).

In deciding whether the defendant had the culpable mental state to commit murder, the jury weighs the evidence introduced at trial. *Childs v. State*, 21 S.W.3d 631, 635 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). A person's knowledge and intent may be inferred from the "acts, words, and conduct" of the accused. *Sholars v. State*, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *see Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). It may also be inferred from the extent of the victim's injuries, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In a murder case, a particularly brutal or ferocious mechanism of death inflicted on a helpless victim can be controlling upon the issue of intent or knowledge. *Martin v.*

12

*State,* 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (concluding evidence of severe brain injuries was legally and factually sufficient to show intent to kill ten-month-old and support a capital murder conviction). Intent and knowledge are fact questions for the jury, and are almost always proven through evidence of the circumstances surrounding the crime. *Childs*, 21 S.W.3d at 635. Intent to kill may be inferred from the use of a deadly weapon. *Henderson v. State*, 825 S.W.2d 746, 749 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). "When a deadly weapon is fired at close range, and death results, the law presumes an intent to kill." *Ervin*, 333 S.W.3d at 200 (quoting *Sholars*, 312 S.W.3d at 694).

Here, the jury was instructed that it could find appellant guilty of capital murder as a principal or as a party.[4] The jury returned a general verdict; therefore, if the evidence is sufficient to support a finding under either of the allegations submitted, we must uphold the jury's verdict. *See Hernandez*, 198 S.W.3d at 261.

Although appellant was not indicted as a party, the charge authorized his conviction as a party to capital murder pursuant to penal code section 7.02(a)(2) or (b). *See* TEX. PENAL CODE ANN. § 7.02(a)(2), (b) (West 2011).[5] A person "is criminally

---

[4] The jury was instructed that it could convict appellant if it believed from the evidence beyond a reasonable doubt that either: (1) appellant caused Marin's death by shooting him with a firearm and appellant was in the course of committing aggravated robbery of Marin; or (2) that Alberto caused Marin's death by shooting him with a firearm, and appellant was in the course of committing aggravated robbery of Marin, and appellant encouraged, directed, aided or attempted to aid Alberto in committing capital murder by purchasing a pair of gloves used in the robbery, planning the robbery with DeArmas, aiding Alberto by threatening Marin with bodily injury or death, or entering Marin's home with Alberto without Marin's consent.

[5] Texas law does not require that an individual be indicted as a party; if the evidence supports a charge on the law of parties, the trial judge may include an instruction on the law of parties despite the lack of such an allegation in the indictment. *Marable v. State*, 85 S.W.3d 287, 287–88 (Tex. Crim. App. 2002); *see also Gomez v. State*, No. 13-09-619-CR, 2010 Tex. App. LEXIS 10250, at *7–8 (Tex. App.— Corpus Christi Dec. 30, 2010, pet. ref'd) (mem. op., not designated for publication) (explaining that "the law of parties is not required to be included in the indictment, and may be included in a jury instruction if

13

responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). Evidence is sufficient to convict under the law of parties where the accused is physically present at the commission of the offense and encourages its commission by words or other agreement. *Hernandez*, 198 S.W.3d at 261. In determining whether an accused participated as a party, the fact finder may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the accused that show an understanding and common design to commit the offense. *Id.* Further, circumstantial evidence may be used to prove party status. *Id.*

Also under penal code section 7.02(b), if:

[I]n the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02(b) (West 2011).

A conspiracy exists when two or more persons, as shown by words or deeds, agree to do an unlawful act. *Butler v. State*, 758 S.W.2d 856, 860 (Tex. App.—Houston [14th Dist.] 1988, no pet.). An agreement may be inferred from the parties' acts, *Snow v. State*, 721 S.W.2d 943, 948 (Tex. App.—-Houston [1st Dist.] 1986, no pet.), and the State may prove a conspiracy by circumstantial evidence. *Butler*, 758 S.W.2d at 860. The agreement must be before or contemporaneous with the criminal event. *Beier v. State*, 687 S.W.2d 2, 4 (Tex. Crim. App. 1985). An agreement of the parties to act

the evidence supports such an instruction as a possible means by which the crime was committed").

14

together in a common design seldom can be proven by direct evidence; reliance, therefore, may be placed upon the actions of parties, showing by either direct or circumstantial evidence an understanding and common design to do a certain act. *Rivera v. State*, 990 S.W.2d 882, 887 (Tex. App.—Austin 1999, pet. ref'd).

## B. Discussion

Here, appellant argues that his DNA evidence found on a glove at the crime scene is only a "modicum" of evidence that does not rationally support his conviction. We disagree. The evidence established that: (1) on March 29, 2009, appellant and Alberto purchased a pair of Wells Lamont gloves like those found at the crime scene; (2) appellant's DNA was found on a Wells Lamont glove recovered at the crime scene; (3) the matching Wells Lamont glove was found in a nearby irrigation ditch, along with other items apparently used in the home invasion; (4) appellant's cell phone records show that he called DeArmas—who knew that Marin had a safe at his house—several hours before the home invasion; (5) appellant initially told the police he did not have a cell phone number and attempted to cancel his cell phone account the day after the home invasion; (6) appellant's van—which he reported as stolen the morning after the home invasion and was recovered later—contained black zip ties and duct tape similar to those found at and near the crime scene; (7) when recovered, the van showed no signs that it had been broken into; and (8) when police attempted to interview DeArmas, he abruptly disappeared and has not been seen since. Viewing the evidence in the light most favorable to the verdict, *see Brooks*, 323 S.W.3d at 898–99, we hold there was legally sufficient evidence to find appellant guilty as a party under section 7.02(a)(2). *See* TEX. PENAL CODE ANN. § 7.02(a)(2). The jury could have found beyond a

15

reasonable doubt that appellant's DNA on the glove and other evidence established that he and Alberto attempted to rob Marin and appellant either (1) shot Marin himself or (2) aided Alberto in shooting Marin. We overrule appellant's third and fourth issues.

## IV. MOTION TO SUPPRESS

By his first issue, appellant contends the trial court erred in denying his motion to suppress statements that he made during the April 18, 2009 interview at the police station. Appellant argues he was in custody during the April 18 interview, was not given *Miranda* warnings, and therefore, statements he made during the interview should have been excluded. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Although appellant does not identify specific statements that he was harmed by, he argues that his "denials of involvement with the purchase of the gloves was offered at trial as incriminating evidence" and that his "denial of any connection to the gloves was harmful and was a factor in the jury's determination of guilt." The State responds that the trial court did not err in finding that appellant's statements were not made during a custodial interrogation and were made voluntarily.

### A. Standard of Review and Applicable Law

Whether the trial court properly denied a defendant's motion to suppress is reviewed under a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007); *Scardino v. State*, 294 S.W.3d 401, 405 (Tex. App.—Corpus Christi 2009, no pet.). We give almost total deference to the trial court's determination of historical facts but review de novo the trial court's application of law to facts not turning on credibility and demeanor. *Scardino*, 294 S.W.3d at 405; *see Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). When, as in this case, the trial

16

court makes no explicit findings of historical fact, the evidence must be viewed in the light most favorable to the trial court's ruling. *St. George*, 237 S.W.3d at 725. We must uphold the trial court's ruling if it is correct under any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005). "Absent a clear abuse of discretion, the ruling on the admissibility of evidence will not be disturbed." *Fonseca v. State*, 881 S.W.2d 144, 149 (Tex. App.—Corpus Christi 1994, no pet.) (citing *Rivera v. State*, 808 S.W.2d 80, 96 (Tex. Crim. App. 1991)).

A trial court's ultimate "custody" determination "presents a 'mixed question of law and fact.'" *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995)). "Therefore, we afford almost total deference to a trial judge's 'custody' determination when the questions of historical fact turn on credibility and demeanor." *Id.* at 526–27. "Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial judge's 'custody' determination de novo." *Id.* at 527.

The United States Supreme Court's decision in *Miranda* and article 38.22 of the Texas Code of Criminal Procedure protect suspects subjected to custodial police questioning. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3 (West 2005); *Herrera*, 241 S.W.3d at 526 (stating that both article 38.22 and *Miranda* apply when persons are in custody and being interrogated); *Ervin*, 333 S.W.3d at 225-27 (same). The failure to comply with the *Miranda* requirements[6] results in forfeiture of the use of any statement

---

[6] *Miranda* warnings include a statement regarding the right to remain silent, that any statement made may be used as evidence, that you have the right to have an attorney present during questioning, and if you are unable to hire an attorney, you have the right to have an attorney appointed if you cannot

obtained during that interrogation. *Ervin*, 333 S.W.3d at 204. "If statements are not made as a result of custodial interrogation, the requirements of *Miranda* and article 38.22 do not apply." *Rodriguez v. State*, 191 S.W.3d 428, 448 (Tex. App.—Corpus Christi 2006, pet. ref'd).

In determining whether an individual was in custody, the ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Id.* at 440. The determination depends on the objective circumstances, not on the subjective views of either the interrogating officers or the person being questioned. *Id.* Moreover, the determination is made on an ad hoc basis. *Id.* at 440–41.

Four general situations may constitute custody for purposes of *Miranda* and article 38.22: (1) the suspect is physically deprived of his freedom of action in any significant way; (2) a law enforcement officer tells the suspect he is not free to leave; (3) law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; or (4) there is probable cause to arrest the suspect, and law enforcement officers do not tell the suspect he is free to leave. *Ervin*, 333 S.W.3d at 205; *Rodriguez*, 191 S.W.3d at 441. The fourth category applies only when the officer's knowledge of probable cause is communicated to the suspect or by the suspect to the officer; even then custody is established only "if the manifestation of probable cause, combined with other

---

afford one. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings largely overlap with those required by the Texas Code of Criminal Procedure, Article 38.22, section 2(a), except that section 2(a) includes an additional warning that the accused "has the right to terminate the interview at any time[.]" TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (West 2005).

circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Ervin*, 333 S.W.3d at 205 (quoting *Gardner v. State*, 306 S.W.3d 274, 295 n.48 (Tex. Crim. App. 2009)); *Rodriguez*, 191 S.W.3d at 441. "[T]he question turns on whether, under the facts and circumstances of the case, 'a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.'" *Ervin*, 333 S.W.3d at 205 (quoting *Nguyen v. State*, 292 S.W.3d 671, 678 (Tex. Crim. App. 2009)).

When a person is transported to a law enforcement facility by an officer in the course of an investigation, if the person was acting upon the invitation, request, or even the urging of an officer, there were no threats that he would be taken in a forcible manner, and the accompaniment is voluntary, then the individual is not in custody. *Rodriguez*, 191 S.W.3d at 441–42; *see Zavala v. State*, 956 S.W.2d 715, 724 (Tex. App.—Corpus Christi 1997, pet. ref'd). Station-house questioning alone does not constitute custody. *Rodriguez*, 191 S.W.3d at 442. However, police conduct during the encounter may cause a consensual inquiry to escalate into a custodial interrogation. *Id.* At trial, the defendant bears the initial burden of proving that a statement was the product of custodial interrogation. *Herrera*, 241 S.W.3d at 526.

## B. Discussion

On January 26, 2011, the trial court held a pre-trial hearing on appellant's motion to suppress. The only witnesses were Officers Tamez and Garcia. Both officers testified that they picked appellant up at his residence on April 18, 2009; appellant agreed to go to the police station for questioning. Officer Tamez described appellant as a "person of interest," not a suspect. The officers were in an unmarked "undercover"

vehicle; appellant was not handcuffed and rode in the front seat. Appellant was offered water or soda during the interview. Appellant was not forced to make any statements, and did not ask to terminate the interview. On cross-examination, Officer Tamez stated that when he and Officer Garcia left the station to obtain a search warrant, he instructed Officer Carrizales to stay with appellant.

Officer Garcia gave similar testimony regarding the April 18 interview with appellant. During the interview, Officer Garcia asked appellant if he wanted to provide a written statement, but appellant declined because he cannot read or write. After telling appellant that the officers had seen the Wal-Mart video of him and Alberto buying gloves, Officer Garcia asked appellant why he was buying gloves; appellant did not answer. Appellant was not a suspect at the time of the interview. Appellant became angry with Officer Tamez and said he would rather talk to Officer Garcia. Appellant did not ask to be taken home. The interview lasted about an hour and a half. On cross-examination, Officer Garcia said that on April 18, he considered appellant a "person of interest" but not a suspect. Officer Garcia asked appellant for a DNA sample, but he refused. When Officer Garcia told him that he would obtain a search warrant authorizing a blood sample, appellant said, "okay." Officer Garcia said that on April 18, he had no probable cause to arrest appellant.

Appellant's counsel argued that the custodial interrogation began when the officers started interviewing appellant at the station. Counsel argued that the officers intended to confront appellant with the video and elicit incriminating responses from him. Although counsel did not identify specific "incriminating responses," he argued that "anything said and anything revealed" by appellant should be suppressed. The State

20

argued that appellant went with the officers voluntarily and was not in custody. The State introduced two exhibits, Officer Tamez's and Officer Garcia's investigative reports, both of which included a chronological summary of the investigation.

On February 10, 2011, the trial court signed an order denying appellant's motion to suppress. The order states, in relevant part, that "the Court holds that [appellant's] statements, admissions or confessions were not a product of custodial interrogation and were voluntarily made."

Viewing the evidence in the light most favorable to the trial court's ruling, *see Herrera*, 241 S.W.3d at 527, we conclude that the trial court did not abuse its discretion in concluding that appellant's statements were not made as a result of custodial interrogation and were therefore admissible. *See Rodriguez*, 191 S.W.3d at 448. The trial court heard testimony that appellant accompanied the officers to the station voluntarily. He was not handcuffed and was free to leave. *See Ervin*, 333 S.W.3d at 211 (finding appellant not in custody where she voluntarily went to police station, was not handcuffed, was told she could leave, was questioned four hours, and went home after making statements); *Chambers v. State*, 866 S.W.2d 9, 19 (Tex. Crim. App. 1993) ("[W]here the circumstances show that the person voluntarily accompanied the police in the investigation of a crime, and he knew or should have known that the police might suspect that he is implicated in the offense, whether he is acting upon the invitation, urging, or request of police officers, and not being forced, coerced or threatened, the act is voluntary and the person is not then in custody"); *see also Bridges v. State*, No. 05-09-00784-CR, 2011 Tex. App. LEXIS 697, at *27 (Tex. App.—Dallas Jan. 21, 2011, pet. ref'd) (not designated for publication) (same). Officers Tamez and Garcia both testified

21

that appellant was not in custody. *See Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997) ("The officer's testimony is a factor to be considered, along with the other facts and circumstances of the detention, in determining whether an arrest has taken place."). The testimony demonstrates that appellant understood that he could decline to provide a written statement and a DNA sample and could refuse to continue talking with Officer Tamez. Officer Garcia stated that on April 18, he did not have probable cause to arrest appellant. Even if Officer Garcia believed he had probable cause to arrest appellant on April 18, the record does not reflect that this was ever manifested to appellant. *See Gardner*, 306 S.W.3d at 294–95 (finding even if officer had probable cause to arrest, appellant not in custody where appellant said nothing to officer that furnished probable cause and officer never told appellant he was a prime suspect); *see also Bridges*, 2011 Tex. App. LEXIS 697, at *28–29 (finding initial non-custodial interview escalated into custodial interrogation when appellant admitted shooting the victim because admission established probable cause to arrest); *Navarro v. State*, No. 10-11-00051-CR, 2011 Tex. App. LEXIS 8041, at *13–14 (Tex. App.—Waco October 5, 2011, no pet.) (mem. op., not designated for publication) (finding no custody even if officer believed he had probable cause to arrest appellant, as belief was not manifested to appellant); *State v. Roberts*, No. 05-09-01328-CR, 2010 Tex. App. LEXIS, at *12–13 (Tex. App.—Waco July 28, 2010, pet. ref'd) (not designated for publication) (finding suspect not in custody during initial portion of interview because even though officer had arrest warrant, the officer's knowledge of probable cause was not communicated or otherwise manifested to suspect and suspect provided no information substantiating probable cause to officer during initial portion of interview).

After the interview was concluded, the officers left to obtain a search warrant. Officer Tamez asked Officer Carrizales to stay with appellant, but there was no evidence that appellant was told that he could not leave. As the State notes, Officer Carrizales was asked to keep an eye on appellant *after* the interview was conducted; thus, even if we assume, without deciding, that appellant was in custody during the time that he was in Officer Carrizales's care, there is no evidence that he was questioned during or after that time.

Moreover, we note that appellant did not provide a harm analysis, other than to assert, without elaboration or citation to authority, that "[a]ppellant's denial of any connection to the gloves was harmful and was a factor in the jury's determination of guilt." Thus, we conclude that appellant's claim that he was harmed by the trial court's denial of his motion to suppress was inadequately briefed. *See* TEX. R. APP. P. 38.1(i). We overrule appellant's first issue.

## V. VALIDITY OF SEARCH WARRANT

By his second issue, appellant contends that the trial court erred in admitting evidence regarding DNA testing of his blood sample because the warrant used to obtain the sample was based on insufficient probable cause. The State responds that the issue is not preserved because appellant did not: (1) challenge the search warrant before the trial court; and (2) object to Edna Zavala's trial testimony that she matched DNA evidence from various items to appellant's DNA profile. The State further argues that even if we consider the merits of appellant's complaint, the search warrant was supported by sufficient probable cause.

23

We agree that it is unnecessary to decide whether the search warrant was based on sufficient probable cause because defense counsel did not preserve this issue. The validity of the search warrant used to obtain appellant's blood sample was not challenged at the suppression hearing or at trial. At trial, there was no objection to Officer Tamez's or Officer Garcia's testimony regarding the search warrant used to obtain the blood sample from appellant. Neither was there an objection to Edna Zavala's testimony regarding the DNA evidence or to the admission of the blood sample evidence. "As a prerequisite to presenting a complaint on appeal, a party must have made a timely and specific request, objection, or motion to the trial court. *Grant v. State*, 345 S.W.3d 509, 512 (Tex. App.—Waco 2011, pet. ref'd) (citing TEX. R. APP. P. 33.1(a)(1)(A)). Here, appellant did not challenge the validity of the search warrant before the trial court. Therefore, we conclude that this issue was not preserved for appellate review. *See* TEX. R. APP. P. 33.1. We overrule appellant's second issue.

## VI. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
31st day of May, 2012.